# UNITED STATES DISTRICT COURT

## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **DELINDA M. MARTINS** | \| |
| **Plaintiff** | \| |
| | \| |
| **Vs.** | \|    **Civil Action No.** |
| | \| |
| **FEDERAL HOUSING FINANCE** | \| |
| **AGENCY,FEDERAL NATIONAL** | \| |
| **MORTGAGE ASSOCIATION, AND** | \| |
| **GREEN TREE SERVICING, LLC** | \| |
| **Defendants** | \| |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES

### *Introduction*

1.     Plaintiff, Delinda M. Martins, is or was the owner of real property located at 11

Farnum Pike, Smithfield, Rhode Island, which has been and continues to be the

primary residence for herself, her husband, and her tenants. Through this action

Plaintiff challenges the lawfulness of the foreclosure sale of her residence which was

conducted on July 3, 2014, by certain Defendants: The Federal National Mortgage

Association ("FNMA" or "Fannie Mae"), an agency or instrumentality of the federal

government; Fannie Mae's conservator and regulator, the Federal Housing Finance

Agency ("FHFA"), a federal agency; and Green Tree Servicing, LLC ("Green Tree")

acting as an agent of Fannie Mae and FHFA. The Defendants Fannie Mae, FHFA,

and Green Tree refused to engage in mediation in good faith as required by state law,

and conducted a foreclosure sale on the Property on July 3, 2014. Plaintiff seeks

declaratory relief, injunctive relief, damages, and other relief from this Court, because

Defendants Fannie Mae, FHFA, and Green Tree acted jointly to deprive Plaintiff of

her interest in the Property by conducting a foreclosure sale without providing her with adequate notice and an opportunity for a meaningful hearing, as required by the Due Process clause of the Fifth Amendment to the Constitution of the United States, and other laws, and caused harm to her in various other ways hereinafter stated.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action and all defendants pursuant to 28 U.S.C. § 1331, because this case arises under the Constitution and laws of the United States.

3.      This Court also has jurisdiction over this action and all defendants pursuant to 28 U.S.C. § 1332 because the parties in this case are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest or costs.

4.      This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

5.      The principal events giving rise to the claims stated herein occurred in this district and venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391 (c)(2).

6.      This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. Rule 57.

## THE PARTIES

7.      The Plaintiff Delinda Martins is a citizen of the United States who resides at 11 Farnum Pike, Smithfield, RI 02917 ("Property").

8.      The Federal Housing Finance Agency ("FHFA") is an independent agency of the United States Federal Government established pursuant to 12 U.S.C. § 4511 *et seq*.

9.      The Federal National Mortgage Association ("FNMA" and "Fannie Mae") is a

corporation organized under the laws of the United States by special charter, to serve

the important governmental objectives of providing stability in the secondary

mortgage market, responding appropriately to the private capital market, providing

ongoing assistance to the secondary market for residential mortgages, promoting

access to mortgage credit throughout the nation by increasing the liquidity of

mortgage investments and improving the distribution of investment capital available

for residential mortgage financing, and managing and liquidating federally owned

mortgage portfolios in an orderly manner, with a minimum of adverse effect upon the

residential mortgage market and minimum loss to the Federal Government. See 12

U.S.C. § 1716.

10.     Green Tree Servicing, LLC ("Green Tree") is a limited liability company organized

under the laws of the State of Delaware, with a principal place of business in St. Paul,

Minnesota.

## GENERAL FACTUAL ALLEGATIONS

### *The Conservatorship of FHFA over Fannie Mae*

11.     In accordance with the Housing and Economic Recovery Act of 2008 ("HERA"), the

federal government established FHFA as a federal agency to supervise and regulate

Fannie Mae and affiliated entities, the Federal Home Loan Mortgage Corporation

("Freddie Mac") and affiliated entities, and any Federal Home Loan Bank. See 12

U.S.C. §§ 4502 (20), 4511(b)(2).

12.     Among the powers the federal government granted to the FHFA pursuant to HERA

was the power of its Director to place Fannie Mae into conservatorship under the

FHFA and the power of the FHFA to operate and control all of Fannie Mae's

operations as its conservator.

13.     On or about September 7, 2008, the Director of the FHFA placed Fannie Mae under
        the conservatorship of the FHFA. See Statement of FHFA Director James B.
        Lockhart, http://www.treasury.gov/press-center/press-
        releases/Documents/fhfa_statement_090708hp1128.pdf , accessed May 12, 2014.
        (Attached as Exhibit 1).

14.     In January 2010, the Congressional Budget Office (hereafter "CBO") concluded that
        the actions taken by FHFA to place Fannie Mae under conservatorship "[made Fannie
        Mae . . .  part of the government and [implied] that [its] operations should be reflected
        in the federal budget." Budgetary Treatment of Fannie Mae and Freddie Mac,
        (Congressional Budget Office Background Paper, 2010), available at
        www.cbo.gov/publications/41887 (Attached as Exhibit 2) at pages 1, 6.

15.     In 2010, the CBO estimate projected cost of the Federal Governments investment in
        Fannie Mae between 2009 and 2019 at $389 billion. See Exhibit 2 at page 9.

16.     In 2013, the CBO again concluded, "the federal government is now the effective
        owner of [Fannie Mae], any gain or loss arising from a change in the way the
        distressed mortgages are handled by [Fannie Mae] would ultimately accrue to
        taxpayers." See Options for Principal Forgiveness in Mortgages Involving Fannie
        Mae and Freddie Mac (Congressional Budget Office, Mitchell Remy & Damien
        Moore, Working Paper No. 2013-02) available at www.cbo.gov/publication/44114
        (Attached as Exhibit 3) at page 1.

17.     As conservator, FHFA controls all of the powers of the shareholders and board of
        directors of Fannie Mae. See Federal National Mortgage Association, Annual Report,

Form 10-K, for the fiscal year ended December 31, 2014

http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2014/10k_2014.pdf , attached as Exhibit 4, at page 25, 162, 166. Shareholders no longer vote for members of Fannie Mae's board of directors, or on any other matters. See Exhibit 4 at page 25, 166.

18.     On November 24, 2008, FHFA reconstituted Fannie Mae's Board of Directors, appointed all nine (9) members of the Board as well as the Board Chairman, and delegated certain powers to the Board while reserving certain powers to itself. See Exhibit 4 at page 162.

19.     FHFA may modify or terminate the delegation of authority to the Board at FHFA's discretion. Exhibit 4 at page 162.

20.     Fannie Mae's Directors serve on behalf of the conservator FHFA and exercise their authority as directed by and with the approval, where required of the conservator. The Directors have no fiduciary duties to any person or entity except to the conservator FHFA. Accordingly, the Directors are not obligated to consider the interest of the company, the holders of equity or debt securities unless specifically directed to do so by the conservator FHFA. See Exhibit 4 at 25, 162.

21.     As a result of the conservatorship, Fannie Mae is not managed with a strategy to maximize shareholder returns. See Exhibit 4 at page 25, 52. FHFA, as both conservator and regulator, and the United States Treasury, pursuant to the senior preferred stock purchase agreement, prohibits Fannie Mae from paying any dividends to common shareholders. See Exhibit 4 at page 52. The net income of Fannie Mae is not available to common stockholders. See Exhibit 4 at page 52.

22.  According to the FHFA's September 7, 2008 explanation of the conservatorship, there is "no exact time frame that can be given as to when this conservatorship may end." FHFA's conservatorship of Fannie Mae will end, according to said explanation, when the Director of FHFA issues an order terminating the conservatorship, after the Director determines that FHFA's "plan to restore the Company to a safe and solvent condition has been completed successfully." See FHFA, Questions and Answers on Conservatorship, (Sept. 7, 2008), available at http://www.treasury.gov/press-center/press-releases/Documents/fhfa_consrv_faq_090708hp1128.pdf. (Attached as Exhibit 5) at page 2; See also Exhibit 4 at page 1 ("Our conservatorship has no specified termination date, and we do not know when or how the conservatorship with terminate, whether we will continue to exist following conservatorship, what changes to our business structure will be made during or following the conservatorship, or what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated.").

23.  As a result of FHFA's conservatorship of Fannie Mae, since September 6, 2008, and continuing now and for the foreseeable future, FHFA directly controls and operates Fannie Mae with all the powers of the shareholders, directors, and officers of Fannie Mae, owns title to all the assets of Fannie Mae, and conducts all business of Fannie Mae.  See Exhibit 4 at Page 25.

24.  HERA does contain a provision automatically terminating FHFA's conservatorship of Fannie Mae, namely if FHFA's director appoints FHFA as receiver of Fannie Mae. *See* 12 U.S.C. 4617(a)(4)(D).  However, FHFA's control over Fannie Mae will not be terminated upon its being appointed as receiver.  There is no other law, regulation,

policy or directive that provides either a date or specifies conditions by which FHFA's control over Fannie Mae will terminate.

25.     Even if the conservatorship were terminated by means other than the appointment of FHFA as receiver of Fannie Mae, Fannie Mae will remain subject to the control of the United States Treasury through the senior preferred stock purchase agreement, senior preferred stock, and warrant to purchase common stock, which can only be canceled or modified with the consent of the United States Treasury. See Exhibit 4 at 51.

26.     On or about September 7, 2008, as restated on or about September 26, 2008, Fannie Mae entered into a senior preferred stock purchase agreement, as amended, with the United States Treasury. Pursuant to the senior preferred stock purchase agreement, Fannie Mae transferred to the United States Treasury 1,000,000 shares of preferred stock, senior in right for both dividends and liquidation to all other preferred or common stock of Fannie Mae, with an initial liquidation preference of $1,000.00 per share; a warrant to purchase 79.9% of the common stock of Fannie Mae at a nominal price; and certain restrictions on Fannie Mae's ability to issue new shares, declare dividends, or dispose of assets without the approval of the United States Treasury; in exchange for the commitment of the United States Treasury to extend up to $100 billion (later amended to $200 billion) to maintain the liquidity of Fannie Mae. See Amended and Restated Senior Preferred Stock Purchase Agreement, dated September 26, 2008, available at http://www.fhfa.gov/Conservatorship/Documents/Senior-Preferred-Stock-Agree/2008-9-26_SPSPA_FannieMae_RestatedAgreement_N508.pdf, attached as Exhibit 6; see also Exhibit 4 at Page 26.

27.     From 2009 through the first quarter of 2012, Fannie Mae received a total of $116.1
billion from Treasury under the senior preferred stock purchase agreement to
maintain a zero net worth. Because the senior preferred stock had an initial
liquidation preference of $1 billion, the current aggregate liquidation preference in
favor of the United States Treasury for the senior preferred stock is $117.1 billion.
See Exhibit 4 at page 11.

28.     The United States Treasury owns 100% of the senior preferred stock of Fannie Mae,
and holds warrants to purchase 79.9% of the common stock of Fannie Mae at a
nominal price on a fully diluted basis on the date of exercise. See Exhibit 4 at page
26, 27; see also Fact Sheet: Treasury Senior Preferred Stock Purchase Agreement
http://www.fhfa.gov/Conservatorship/Documents/Senior-Preferred-Stock-
Agree/2008-8-7_SPSPA_FactSheet_508.pdf attached as Exhibit 7.

29.     By virtue of the senior preferred stock purchase agreement, as amended, the United
States Treasury is entitled to receive quarterly dividends equal to the entire net worth
of Fannie Mae, which results in every dollar of earnings being paid to the United
States Treasury.  See Exhibit 4 page 27, 52. Similarly, Fannie Mae is not permitted to
retain earnings, rebuild a capital position, or pay dividends or other distributions to
stockholders other than the United States Treasury. See Exhibit 4 at page 2.

30.     Including the 2014 dividend payments to the United States Treasury, Fannie Mae will
have paid a total of $134.5 billion in dividends to Treasury on the senior preferred
stock. However, under the terms of the senior preferred stock purchase agreement,
dividend payments do not offset prior Treasury draws, and, therefore, the Treasury's

ownership interest in Fannie Mae is not diminished by reason of the dividends. See Exhibit 4 at page 2, 11.

31.   The CBO considers the payments from Fannie Mae to the Treasure "intragovernmental payments, which to not affect net federal outlays." See Exhibit 2 at page 3.

32.   Pursuant to the senior preferred stock purchase agreement, Fannie Mae is not permitted to redeem the senior preferred stock prior to the termination of the United States Treasury's funding commitment, which commitment will not terminate until all of Fannie Mae's liabilities have been satisfied. See Exhibit 4 at page 25, 115.

33.   Because Fannie Mae was chartered by Congress to further governmental objectives related to the secondary mortgage market and national housing policies, because the federal government maintains a substantial ownership interest in Fannie Mae, because Fannie Mae is substantially funded by the federal government, because the Board of Directors of Fannie Mae is entirely appointed by FHFA, and because Fannie Mae is under the control of FHFA and/or the United States Treasury, Fannie Mae is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the federal government by the United States Constitution.  See DOT v. Ass'n of Am. R.R., 135 S. Ct. 1225, 1232-1233 (U.S. 2015); Lebron v. National Railroad Passenger Corp., 513 U.S. 374 (1995).

   ***The Agency Relationship between FHFA and Fannie Mae and Green Tree.***

34.   Fannie Mae purchases mortgages that meet its underwriting standards from originators such as banks or thrifts. Fannie Mae holds these mortgages in its retained portfolios or packages them into mortgage-backed securities that it sells to investors.

See FHFA Office of Inspector General Evaluation Report, <u>FHFA's Oversight of the Servicing Alignment Initiative</u>, February 12, 2014, available at

http://fhfaoig.gov/Content/Files/EVL-2014-003.pdf (attached as Exhibit 8) at page 6.

35.    For the mortgages that Fannie Mae purchases, Fannie Mae enters into contracts with mortgage servicers, including the "Servicing Guide" and other agreements. Under the terms of these agreements, the servicer collects mortgage payments, sets aside taxes and insurance premiums in escrow, forwards interest and principal payments to the contractually designated party, and responds to payment defaults. Exhibit 8 at Page 8.

36.    Through the "Servicing Guide" and other agreements, Fannie Mae established certain requirements for its servicers to follow when it performs its servicing duties, which include specific instructions on mitigating losses after borrowers default and conducting foreclosures on behalf of Fannie Mae. See Exhibit 8 at pages 8-9.

37.    After FHFA placed Fannie Mae into conservatorship, FHFA has engaged in continuous supervision of Fannie Mae's oversight of its servicers, including Green Tree. See FHFA Office of Inspector General, <u>FHFA's Supervision of Freddie Mac's Control's over Mortgage Servicing Contractors</u>, March 7, 2012, available at

http://fhfaoig.gov/Content/Files/AUD%202012-001_0.pdf (Attached as Exhibit 9) at Pages 19-20. FHFA's Office of Inspector General describes "continuous supervision" as "a wide range of ongoing activities designed to monitor and analyze [Fannie Mae's] overall business profile, including any trends or associated emerging risks." See Exhibit 9 at page 20.

38.    Among other supervisory actions, in April, 2011, FHFA created the Servicer Alignment Initiative, as amended by four additional initiatives beginning in January

2012 (collectively, "SAI"), by which the FHFA directs the actions taken by Fannie

Mae's mortgage servicers when servicing a delinquent mortgage loan, in order to

maximize the financial benefits to Fannie Mae, and ultimately to the taxpayers. See

Exhibit 8 at Pages 9-11.

39. Through the SAI, the FHFA directed Fannie Mae to update its servicing guidelines by

adding new standards and timelines by which servicers were to manage delinquent

mortgages. See Exhibit 8 at page 10.

40. Through the SAI, the FHFA created specific requirements for servicers to follow

including state-level timelines for the processing of foreclosures from the date of

referral to the attorney/trustee through the date of the foreclosure sale. See Exhibit 8

at page 10.

41. Through the SAI, the FHFA has directed Fannie Mae's servicers to use non-judicial

foreclosure procedures, which authorize the seizure of property without a pre-

deprivation hearing as required by the Due Process Clause of the Fifth Amendment.

### The Plaintiff' interest in the Property

42. On or about August 7, 2006, Lisa Erice and the Plaintiff transferred an interest in the

Property by Quitclaim Deed to the Plaintiff, which deed is recorded with the land

records of the Town of Smithfield on August 28, 2006, at Book 515 and Page 237.

The Quitclaim Deed is attached as Exhibit 10.

43. On or about January 23, 2007, the Plaintiff borrowed $195,000.00 from Shamrock

Financial Corporation ("Originating Lender"), which was evidenced by a promissory

note (the "Note") on the same date.

44.     On or about the same date, the Note was secured by a mortgage ("Mortgage") in favor of the Originating Lender and Mortgage Electronic Registration Systems, Inc., as nominee for the Originating Lender and its successors and assigns. The Mortgage was recorded on January 29, 2007, in the land records of the Town of Smithfield at Book 548 and Page 339. The Mortgage is attached as Exhibit 11.

### *The foreclosure proceedings against the Property*

45.     On May 13, 2008, Mortgage Electronic Registration Systems, Inc. as nominee for Shamrock Financial Corporation, purported to assign its interest in the Mortgage to Federal National Mortgage Association by an assignment recorded on May 19, 2008 in the land records for the Town of Smithfield at Book 638 and Page 249. See Exhibit 12.

46.     Upon information and belief, Fannie Mae transferred its interest in the Mortgage to Bank of America, N.A. by an assignment which is not recorded.

47.     On or about June 18, 2013, Bank of America, N.A. transferred its interest in the Mortgage to Green Tree Servicing, LLC, by an assignment recorded on July 2, 2013 in the land records for the Town of Smithfield at Book 919 and Page 13. See Exhibit 13.

48.     On or about April 22, 2014, Green Tree referred the Plaintiff's Mortgage account to Harmon Law Offices, P.C. to commence foreclosure proceedings.

49.     On May 8, 2014, on behalf of the Defendants, Harmon Law Offices, P.C. sent a notice of foreclosure sale ("Notice") to the Plaintiff. The Notice is attached as Exhibit 14. In the Notice, Harmon Law Offices P.C. stated its intention to sell the property described in the Mortgage, on July 3, 2014 at 10:00 a.m.

50.     Prior to the receiving the Notice, Plaintiff did not receive any correspondence from the Defendants concerning the possibility of a mediation conference as described in Rhode Island General Laws § 34-27-3.2.

51.     On or about July 3, 2014, Fannie Mae conducted a foreclosure sale of the Property, in which it presented the only bid in the amount of $ 280,096.02.

52.     On August 5, 2014, Fannie Mae, by Green Tree as Attorney in Fact, signed a document (hereinafter referred to as "the Foreclosure Deed" without prejudice as to its legal effect), which was recorded on August 13, 2014 in the land records for the Town of Smithfield at Book 968 and Page 271. The Foreclosure Deed is attached as Exhibit 15.

53.     Neither Green Tree, Fannie Mae, nor FHFA have not provided the Plaintiff an opportunity for an evidentiary hearing with Fannie Mae or FHFA at which the Plaintiff could have an opportunity to: confront and cross-examine persons who supplied information upon which the foreclosure action is grounded; present arguments and evidence to dispute the allegations of Green Tree, Fannie Mae, and FHFA prior to the termination of her interest in the Property; be represented by counsel during a hearing prior to the termination of her interest in the Property; and to have a neutral informal hearing officer make a determination based on applicable law and the evidence adduced at a hearing prior to the termination of the Plaintiff's interest in the Property.

54.     Had the Plaintiff had an opportunity for a hearing, she could have presented evidence to challenge the foreclosure in one or more of the following ways:

        a.   Fannie Mae was not the mortgagee on the date of the foreclosure sale.

     b.   Fannie Mae failed to provide the required foreclosure notices to the Plaintiff, to comply with Rhode Island foreclosure statutes including § 34-27-3.2.

     c.   Fannie Mae failed to act in good faith as required and defined by § 34-27-3.2.

55.     On or about April 6, 2015, the Defendant Fannie Mae filed a complaint for eviction against the Plaintiff in Sixth Division District Court, Providence County, Rhode Island.

56.     If these eviction action is not enjoined, Plaintiff will suffer irreparable harm, in that the Plaintiff, her family and tenant, will lose possession of her primary residence and she, her family, and her tenant currently have no other place to reside.

## COUNT I – DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS

57.     Plaintiff realleges and incorporates paragraphs 1-56 by reference.

58.     Fannie Mae, and FHFA acted jointly to deprive the Plaintiff of her ownership rights in the Property by conducting a foreclosure sale pursuant to Rhode Island General Laws Chapter 34-27, entitled "Mortgage Foreclosure and Sale," which authorizes mortgagees to foreclose the rights of an equitable title holder without judicial process or the opportunity to be heard before the foreclosure sale.

59.     When used by a federal government actor, the procedures of Rhode Island General Laws Chapter 34-27 do not satisfy the Due Process Clause of the Fifth Amendment before depriving an owner of his or her property. Specifically, Chapter 34-27 does not provide for adequate notice, an opportunity to be heard before the deprivation of her property, or the opportunity to recover appropriate damages for an improper deprivation of property.

60.     Pursuant to the Due Process Clause of the Fifth Amendment to the United States

Constitution, Fannie Mae and FHFA, as agencies and/or instrumentalities of the federal government, owed a higher degree of notice and hearing to Plaintiff than is provided by Rhode Island General Laws chapter 34-27 before depriving the Plaintiff of her property.

61.    The Plaintiff has a significant property interest at stake. The foreclosure, if allowed to stand, permanently deprives the Plaintiff of her ownership, possession, and use of the Property, which she uses as her primary residence; clouds the title to the Property; impairs her ability to sell, rent, or otherwise alienate the Property; taints her credit rating; reduces the chance of her obtaining a future loan or mortgage; subjected her to eviction; and jeopardizes her security in a dwelling place.

62.    There is a significant risk of an erroneous deprivation of the Plaintiff's interest through the procedures used by Fannie Mae, and FHFA pursuant to RI General Laws chapter 34-27. To prevent an erroneous deprivation of property, the Due Process Clause of the Fifth Amendment to the United States Constitution requires Fannie Mae, and FHFA to provide Plaintiff with an opportunity to be heard at a meaningful time on, *inter alia,* any challenge to the true ownership of the Note; any challenge to Fannie Mae's and/or FHFA's authority to foreclose on behalf of the owner of the Note; any challenge to Fannie Mae's and/or FHFA's determination of default under the Note and Fannie Mae's and/or FHFA's calculation of deficiency; to challenge Fannie Mae's and/or FHFA's determination that the Plaintiff is not eligible for a loan modification, a repayment, or other homeowner assistance option; the opportunity to refinance or reinstate through other sources of funding; whether Fannie Mae and/or FHFA acted in good faith; and any challenge to Fannie Mae's and/or FHFA's

compliance with applicable notice procedures.

63.     The government's financial interest in obtaining ownership, possession, and use of

the Property is minimal.

64.     There are no exigent circumstances that would justify the lack of a pre-deprivation

hearing, nor would a meaningful hearing before a neutral party impose significant

fiscal or administrative burdens.

65.     Fannie Mae and FHFA violated the Plaintiff's Fifth Amendment procedural due

process rights by conducting a non-judicial foreclosure sale pursuant to Rhode Island

General Laws Chapter 34-27 without first providing adequate notice, a meaningful

hearing prior to the deprivation of property, and an opportunity to recover adequate

damages.

## COUNT II – VIOLATION OF RHODE ISLAND GENERAL LAWS § 34-27-3.2

66.     The Plaintiff realleges and incorporates paragraphs 1-65 by reference.

67.     Rhode Island General Laws § 34-27-3.2 requires a mortgagee, or its servicing agent,

to obtain a certificate of compliance before sending a notice of foreclosure sale under

§ 34-27-4 (b). See § 34-27-3.2 (d) (P.L. 2013, ch. 325, attached as Exhibit 14). The

mortgagee obtains a certificate of compliance from the mediation coordinator at

Rhode Island Housing either by sending a required notice of a mediation conference

to a mortgagor and not receiving a response from the mortgagor; See § 34-27-3.2 (h);

or by participating in a mediation conference in good faith; See § 34-27-3.2 (i).

68.     The Defendants did not comply with § 34-27-3.2 before sending the Notice of

Mortgage Foreclosure Sale pursuant to § 34-27-4 (b). The Defendants did not send

the Plaintiffs the required notice of mediation conference to the Plaintiffs, and did not

participate in a mediation conference with Rhode Island Housing in good faith.

69.     Pursuant to 34-27-3.2 (n), because the Defendants failed to comply with § 34-27-3.2,

the foreclosure sale that occurred on July 3, 2014, was void, "without limitation of the

right of the mortgagee thereafter to re-exercise its power of sale or other means of

foreclosure upon compliance with this section."


WHEREFORE, The Plaintiff respectfully requests the Court to grant the following relief:

1)      A declaration that the Fannie Mae's and FHFA's use of non-judicial foreclosure

process in Rhode Island General Laws Chapter 34-27-4 (b), or any foreclosure

process that does not provide for adequate notice, a meaningful evidentiary

hearing prior to the deprivation of property, and an opportunity to recover

damages, violated the Plaintiff's due process rights under the Fifth Amendment to

the Constitution of the United States;

2)      A declaration that the foreclosure sale of the Plaintiff's Property on July 3, 2014,

was invalid and void;

3)      A declaration that the foreclosure deed recorded on August 13, 2014, in the land

records for the Town of Smithfield at Book 968 and Page 271, is invalid and void;

4)      A preliminary injunction and permanent injunction enjoining Fannie Mae and

FHFA from foreclosing on the Plaintiff's Property through the use the non-

judicial foreclosure process in Rhode Island General Laws Chapter 34-27-4 (b), or

any other foreclosure process that does not provide adequate notice, a meaningful

hearing prior to the deprivation of property, and an opportunity to recover

damages if the foreclosure is deemed erroneous;

5) A preliminary injunction and permanent injunction enjoining Fannie Mae, and FHFA from foreclosing on the Plaintiff's Property without complying with Rhode Island General Laws § 34-27-3.2;

6) A preliminary injunction and permanent injunction enjoining Fannie Mae from evicting the Plaintiff, members of Plaintiff's household and her tenants from the Property;

7) A preliminary injunction and permanent injunction requiring Defendants to execute and cause to be recorded a deed correcting and voiding the aforementioned foreclosure deed and quitting their claim to the Property back to Plaintiff.

8) An order quieting title and declaring the rights and interests of all parties in the Property;

9) Costs; and

10) Such other and further relief as the court considers appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

Delinda M. Martins
By her Attorneys,


/s/ Jeffrey C. Ankrom, Esq.
Jeffrey C. Ankrom, Esq. (#7663)
Rhode Island Legal Services
56 Pine Street, Suite 400
Providence, RI, 02903
(401) 274-2652, ext. 138
(401) 453-0310 fax
jankrom@rils.org


/s/ Eric Bither, Esq.
Eric Bither, Esq. (#8910)
Rhode Island Legal Services
56 Pine Street, Suite 400
Providence, RI, 02903
(401) 274-2652, ext. 141
(401) 453-0310 fax
ebither@rils.org

Dated: June 11, 2015